UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

HIGH FALLS BREWING COMPANY, LLC,
HIGH FALLS OPERATING CO., LLC,
NORTH AMERICAN BREWERIES, INC.,
and KPS CAPITAL PARTNERS LP,             DECISION AND ORDER

                         Plaintiff,        10-CV-6100 CJS

     -v-

BOSTON BEER CORPORATION,

                         Defendants.

_____

APPEARANCES

For High Falls Brewing
Company, LLC:
                        Jerauld E. Brydges, Esq.
                        Kimberly I. Shimomura, Esq.
                        Harter, Secrest and Emery, LLP
                        1600 Bausch & Lomb Place
                        Rochester, New York 14604-2711

For High Falls Operating
Co, LLC, North American
Breweries, Inc. and KPS
Capital Partners LP:
                        Randall David White, Esq.
                        Terrence M. Connors, Esq.
                        Connors & Vilardo, LLP
                        1000 Liberty Building
                        424 Main Street
                        Buffalo, New York 14202

                        Gregory M. Boyle, Esq.
                        Erinn L. Wehrman, Esq.
                        Jenner & Block, LLP
                        353 North Clark Street
                        Chicago, Illinois 60654-3456

For Defendant:              Richard A. McGuirk, Esq.
                        George J. Skelly, Esq.
                        J. Christopher Allen, Esq.
                        Nixon Peabody LLP
                        1100 Clinton Square
                        Rochester, New York 14604

INTRODUCTION

This is a diversity action arising from a contractual dispute, in which Plaintiffs seek permanent injunctive relief and a declaratory judgment that they are not required to arbitrate certain aspects of the dispute. Now before the Court is an application (Docket No. [#7]) by Plaintiffs for a preliminary injunction prohibiting Defendant from arbitrating certain claims in an arbitration action that Defendant commenced on or about February 8, 2010. For the reasons that follow, the application is denied.

BACKGROUND

Plaintiff High Falls Brewing Company, LLC ("HFBC") was a brewing company located in the High Falls District of the City of Rochester, New York. In addition to brewing its own brands of beer, HFBC performed contract brewing services for third parties, including Defendant Boston Beer Corporation ("Boston Beer" or "Defendant"). In December 2004, HFBC and Boston Beer executed an agreement entitled "Third Amended and Restated Production Agreement Between Boston Beer Corporation And High Falls Brewing Company, LLC ("the Production Agreement").[1] The Production Agreement states that it will "interpreted and construed in accordance with the law of the State of New York." (*Id*. § 21). The Production Agreement contains an arbitration clause, which states, in pertinent part:

> 26. ARBITRATION
> Any controversy or claim arising out of or relating to this December 2004 Agreement, or the breach hereof, with the exception of any claim for a temporary restraining order or preliminary or permanent injunctive relief to enjoin any breach or threatened breach hereof, shall be settled by binding arbitration to be conducted by the American Arbitration Association ('AAA') in New York City in accordance with the Optional Procedures for Large Complex Commercial Disputes (the "Complex Procedures"), and to the

---

[1] The Production Agreement was for an initial five-year term, which could be extended for another five-year term.

2

extent any such matter is not addressed by the Complex Procedures, in accordance with the Commercial Arbitration Rules of applying the laws of New York.

(*Id*. § 26).

As part of the Production Agreement, HFBC and Boston Beer anticipated that it would be necessary for Boston Beer to purchase new equipment and parts for use at HFBC's plant. (Production Agreement § 9). The Production Agreement refers to a lease to cover such equipment, entitled the Equipment Lease for Required Additional Equipment ("the Additional Equipment Lease"). (*Id*.). [2] The Additional Equipment Lease was executed at the same time as the Production Agreement. The Production Agreement states that at the end of the contract term, the disposition of equipment under the Additional Equipment Lease "shall be determined in accordance with the terms outlined in the [Additional Equipment Lease]." (*Id*. § 9(d)). The Additional Equipment Lease contains a provision that states, in pertinent part: "5.5 ENTIRE AGREEMENT. This Equipment Lease *and the Production Agreement* constitute the entire agreement between Lessor and Lessee with respect to the lease of the Leased Assets." (Additional Equipment Lease § 5.5) (emphasis added). The Additional Equipment Lease also contains a forum selection/dispute resolution clause, which states:

> **5.7 GOVERNING LAW AND JURISDICTION**. THIS EQUIPMENT LEASE SHALL BE GOVERNED IN ALL RESPECTS BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES. THE PARTIES CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE COURTS OF THE NEW YORK AND THE

---

[2] The Additional Equipment Lease pertained to equipment that would benefit the production of Boston Beer's products, but that could "also be beneficially used by [HFBC] to produce its own products." (*Id*. § 9(c)). The Production Agreement states that "Required Additional Equipment may include, but not be limited to, investments in tank re-lining and repair, yeast propagation equipment and systems, centrifuges, water deaeration equipment, hop slurry systems, Optek sensors, improvements to malt handling systems and CO2 counter pressure systems, and upgrades to brew house vessels." (*Id*. § 9(c)).

FEDERAL COURTS SITTING IN NEW YORK, FOR THE RESOLUTION OF
ANY DISPUTES UNDER ANY LEASE DOCUMENT.

(*Id*. § 5.7). The Additional Equipment Lease contains no reference to arbitration.[3]

The Production Agreement also refers to another lease, entitled the Equipment Lease for Bottling Line 2 ("the Line 2 Lease").[4] The Line 2 Lease was executed at the same time as the Production Agreement. The Line 2 Lease covers equipment that had apparently been purchased by Boston Beer and installed in HFBC's plant pursuant to an earlier version of the Production Agreement. The Line 2 Lease contains a provision stating, in pertinent part: "5.5 ENTIRE AGREEMENT. This Equipment Lease constitutes the entire agreement between Lessor and Lessee with respect to the Leased Assets." (Line 2 Lease § 5.5). The Line 2 Lease further contains a section entitled "Remedies," which states, in pertinent part, that in the event of any default under the lease, Boston Beer "may exercise any one or more of the following remedies: (a) proceed, *by appropriate court action*, to enforce performance by Lessee of the applicable covenants . . . ." (Id. § 4.2) (emphasis added). The Line 2 Lease also contains a forum selection/dispute resolution clause, which states:

> **5.7 GOVERNING LAW AND JURISDICTION**. THIS EQUIPMENT LEASE SHALL BE GOVERNED IN ALL RESPECTS BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES. THE PARTIES CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE COURTS OF THE NEW YORK AND THE

---

[3] As indicated above, the record before the Court contains copies of the Line 2 Lease and the Additional Equipment Lease. The record does not contain a copy of the Equipment Lease (the Equipment Lease for Boston Beer Equipment), so it is unclear whether such third lease was actually executed. In any event, the subject dispute only involves the Line 2 Lease and the Additional Equipment Lease. (*See*, Original Arbitration Complaint ¶ 77).

[4] The Production Agreement also refers to a third lease, entitled The Equipment Lease for Boston Beer Equipment ("the Equipment Lease"). *Id*. § 10(c). The Equipment Lease pertained specifically to equipment that would have to be purchased to facilitate the production of Boston Beer products which HFBC had not previously produced. (*Id*. § 9(b)). However, the subject dispute only involves the Line 2 Lease and the Additional Equipment Lease. (*See*, Original Arbitration Complaint ¶ 77).

FEDERAL COURTS SITTING IN NEW YORK, FOR THE RESOLUTION OF
ANY DISPUTES UNDER ANY LEASE DOCUMENT.

(*Id*. § 5.7). The Line 2 Lease contains no reference to arbitration.

In April 2006, HFBC and Boston Beer executed a supplement to the Production Agreement, entitled "Third Amended and Restated Production Agreement - Supplement." ("the April 2006 Supplement"). In pertinent part, the April 2006 Supplement grants Boston Beer a "continuing security interest" in certain production equipment, including equipment "purchased by Boston Beer to modernize [HFBC's] No. 2 bottling line." (April 2006 Supplement, Schedule B, p. 3 ). The Supplement further states: "Except as modified by the foregoing provisions, the Agreement [Production Agreement] and the other contractual arrangements contained therein, as currently in effect, will remain unaffected." (*Id*. at p. 2).

In June 2006, HFBC and Boston Beer executed another supplement to the Production Agreement, entitled "Third Amended and Restated Production Agreement - Supplement ("the June 2006 Supplement"). In pertinent part, the June 2006 Supplement grants Boston Beer a "continuing security interest" in certain production equipment, including equipment "purchased by Boston Beer to modernize [HFBC's] No. 2 bottling line." (June 2006 Supplement, Schedule B, p. 3). The Supplement further states: "Except as modified by the foregoing provisions, the Agreement [Production Agreement] and the other contractual arrangements contained therein, as currently in effect, will remain unaffected." (*Id*. at p. 2).

In December 2007, HFBC and Boston Beer executed another amendment to the Production Agreement. (Boston Beer letter dated December 12, 2007, accepting proposed amendment, "the December 2007 Amendment") ("[T]he existing production agreement between [HFBC] and [Boston Beer] is now amended accordingly."). The December 2007

5

Amendment covered various matters, including the volume of beer to be produced/purchased during 2008 and 2009. The December 2007 Amendment also detailed certain equipment to be purchased by Boston Beer for HFBC's use, including a piece of equipment called a "Carbo Cooler." The December 2007 Amendment also addressed monies owed by HFBC in connection with equipment purchased by Boston Beer for HFBC's use in connection with Bottling Line No. 2.

In January 2009, the parties executed another amendment to the Production Agreement ("the January 2009 Amendment"). In that regard, Boston Beer wrote to HFBC, concerning monies owed by Boston Beer to HFBC under the Production Agreement for 2008. (Docket No. [#7-7]). Boston Beer proposed a set-off arrangement, pursuant to § 5(d) of the Production Agreement, pursuant to which monies owed to by Boston Beer to HFBC would be offset against monies owed by HFBC to Boston Beer under the equipment leases. Significantly, as part of the proposal, Boston Beer referred to "the Carbo Cooler" as being "subject to the Equipment Lease for Required Additional Equipment." On January 8, 2009, HFBC countersigned the proposal, indicating that it "[a]cknowledged, accepted, and agreed to" the proposal.

In or about February 2009, Plaintiff High Falls Operating Co., LLC ("OpCo") and others executed an Asset Purchase Agreement with HFBC, pursuant to which OpCo purportedly purchased some, but not all, of HFBC's assets and liabilities. In pertinent part, the Asset Purchase Agreement stated that OpCo was *not* purchasing assets consisting of, *inter alia*, the Production Agreement and the "Equipment Lease Agreement for Required Additional Equipment."[5]

---

[5] The "Equipment Lease Agreement for Boston Beer Equipment" was also listed as an excluded asset. The schedule of excluded assets does not refer to the Line 2 Lease.

6

In June 2009, HFBC wrote to Boston Beer, indicating that HFBC was exercising its right to purchase the equipment covered by the Line 2 Lease and the Additional Equipment Lease, including the Carbo Cooler. In that regard, HFBC indicated that any amounts that had been owed by HFBC to Boston Beer for the equipment were paid by virtue of the set-off arrangement agreed to in the January 2009 Amendment. However, Boston Beer rejected HFBC's claim of ownership over the equipment.

In February 2010, Boston Beer commenced an arbitration proceeding against HFBC, OpCo, and North American Breweries, Inc. ("NAB") and KPS Capital Partners LP ("KPS").[6] The arbitration complaint alleged that HFBC and OpCo breached the Production Agreement, and that OpCo, NAB, and KPS wrongfully interfered with the Production Agreement. The complaint further alleged that HFBC, OpCo, NAB, and KPS had converted equipment belonging to Boston Beer, including the Line 2 equipment and the Carbo Cooler. With respect to this contention, Boston Beer indicated that "the Carbo Cooler is included among equipment covered by the Additional Equipment Lease." (Arbitration Complaint ¶ 39; *see also id*. at ¶ 42).[7] Additionally, the complaint sought to foreclose Boston Beer's security interest in the Line 2 equipment. With regard to arbitrability, Boston Beer alleged in the arbitration complaint that the Line 2 Lease and Additional Equipment Lease were "integrally related" to the Production Agreement, and that disputes involving such equipment were therefore "subject to arbitration pursuant to paragraph 26 of the Production Agreement." (*Id*. ¶ ¶ 49-51).

---

[6]At that time, the rules of the American Arbitration Association, Rule R-7(a), stated in pertinent part that, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."

[7]Boston Beer also included an alternative allegation, stating that "Boston Beer leased the Carbo Cooler to High Falls not under the Additional Equipment Lease, but pursuant to an informal arrangement that did not grant High Falls and option to purchase the equipment." (Arbitration Complaint ¶ 45).

7

On March 1, 2010, Plaintiffs commenced this action. OpCo, NAB, and KPS seek a declaratory judgment that they are not required to arbitrate any claims, since they are not parties to the Production Agreement or the leases. HFBC seeks a narrower declaratory judgment that it is not required to arbitrate the claims arising from the equipment leases, since the leases do not contain an arbitration clause. HFBC concedes, though, that it must arbitrate claims that arise under the Production Agreement. Additionally, all of the Plaintiffs seek a declaratory judgment that they are not liable to Boston Beer for any of the claims asserted in Boston Beer's arbitration complaint.

On April 5, 2010, Plaintiffs filed the subject application for a preliminary injunction. OpCo, NAB, and KPS seek a preliminary injunction directing that they are not required to arbitrate any of Boston Beer's claims, while HFBC seeks a preliminary injunction indicating that it is not required to arbitrate claims arising from the equipment leases.

On April 20, 2010, Boston Beer amended its arbitration complaint and dropped its claims against OpCo, NAB, and KPS. Consequently, Boston Beer maintains that the motion for preliminary injunctive relief by OpCo, NAB, and KPS is now moot. In response to HFBC's application for preliminary injunctive relief, Boston Beer argues that the issue of arbitrability must be decided as part of the arbitration proceeding. Alternatively, Boston Beer contends that this Court should deny the application, and that HFBC is required to arbitrate claims relating to the equipment leases, since those claims are covered by the arbitration clause in the Production Agreement. Boston Beer further maintains that issues relating to the Carbo Cooler necessarily arise under the Production Agreement, and hence are arbitrable, since neither the Equipment Lease nor the Additional Equipment Lease lists the Carbo Cooler on their schedules of covered equipment.

In reply, OpCo, NAB, and KPS insist that the claims against them are not moot, since Boston Beer could reassert claims against them by simply amending the arbitration complaint. As for HFBC, it maintains that it will suffer irreparable harm if it is forced to arbitrate claims under the lease agreements. Moreover, HFBC contends that although the Production Agreement contains an arbitration clause, the lease agreements are governed by "specific judicial selection provisions," i.e. the forum selection/dispute resolution clauses. Consequently, HFBC argues, it is likely to succeed on the merits of its claim.

On May 6, 2010, counsel for the parties appeared before the Court for oral argument. At that time, Boston Beer's counsel and counsel for OpCo, NAB, and KPS agreed that the motion for preliminary injunctive relief by OpCo, NAB, and KPS is now moot, and that if Boston Beer ever decides to re-institute arbitration claims against OpCo, NAB, and KPS, it will first notify Plaintiffs and this Court. With regard to the remaining issues in the pending motion, counsel for HFBC and Boston Beer agreed that all of the various documents discussed above, including the Production Agreement as amended and the lease agreements, must be construed together. Further, counsel for HFBC and Boston Beer agreed that the arbitration clause is broad.

## DISCUSSION

At the outset, the Court finds that the application by OpCo, NAB, and KPS is moot. Boston Beer has discontinued its arbitration claims against these plaintiffs, and counsel for the parties have agreed that any attempt to revive those claims will take place as part of this action. Accordingly, the application for preliminary injunctive relief by OpCo, NAB, and KPS is denied as moot.

Turning to HFBC's application, the standard to be applied when considering an application for a preliminary injunction is well settled:

> For the last five decades, this circuit has required a party seeking a preliminary injunction to show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

HFBC contends that it will suffer irreparable harm if it is forced to arbitrate claims relating to the equipment leases.[8] In the context of an injunction application involving the duty to arbitrate, it is undisputed that "[c]ompelling arbitration of a matter not properly subject to arbitration constitutes *per se* irreparable harm." *Citigroup Global Mkts, Inc. v. VCG Special Opportunities Master Fund Ltd.*, No. 08-CV-5520 (BSJ), 2008 WL 4891229 at *2 (S.D.N.Y. Nov. 12, 2008) (citation and internal quotation marks omitted), *aff'd*, 598 F.3d 30 (2d Cir. 2010). The Court therefore finds that HFBC would suffer irreparable harm if it was required to arbitrate claims when it had not agreed to do so.

HFBC further maintains that it is likely to succeed on the merits of its claim, since claims involving the equipment leases are not arbitrable. At the outset, however, the Court must decide whether arbitrability should be decided by the Court or by an arbitrator. Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § § 1, 2,[9]

> the role of courts is limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate.[10]

---

[8] Boston Beer agrees that OpCo, NAB, and KPS have argued that they would suffer irreparable harm, but contends that HFBC has not made the same argument. The Court disagrees and finds that HFBC has claimed that it will suffer irreparable harm if it is forced to arbitrate claims relating to the equipment leases.

[9] The FAA applies because the parties' agreements affect interstate commerce. *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003).

[10] *See also, Eaton Vance Mgt. V. Forstmannleff Assocs., LLC*, No. 06 Civ. 1510(WHP), 2006 WL 2331009 at *4 (S.D.N.Y. Aug. 11, 2006) ("In reviewing the arbitrability of Tooke's claims, the court must determine (1) whether the parties agreed to arbitrate; and (2) whether the scope of the agreement ecompasses *the claims asserted*.") (emphasis added).

> In addressing these issues, courts are mindful that arbitration is a matter of contract, and that parties cannot be compelled to arbitrate issues that they have not specifically agreed to submit to arbitration. Whether parties have obligated themselves to arbitrate certain issues, including the question of arbitrability, is determined by state law. Nevertheless, under the FAA, certain presumptions inform the analysis. Specifically, the federal policy in favor of arbitration requires that any doubts concerning the scope of arbitrable issues" be resolved in favor of arbitration.
>
> An important exception applies, however, when the doubt concerns who should decide arbitrability. The law then reverses the presumption to favor judicial rather than arbitral resolution. Thus, as federal case law makes plain, the issue of arbitrability may only be referred to the arbitrator if there is "clear and unmistakable" evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator.
>
> New York law follows the same rule, *i.e.*, it acknowledges the well settled proposition that the question of arbitrability is an issue generally for judicial determination, but at the same time it recognizes an important legal and practical exception when parties evince a "clear and unmistakable" agreement to arbitrate arbitrability.

*Id*. at 120-121 (citations and internal quotation marks omitted).

Consequently, the Court must decide whether HFBC and Boston Beer made a "clear and unmistakable" agreement to arbitrate the issue of arbitrability, with regard to issues involving equipment. On this point, as discussed above, the arbitration clause states, in pertinent part:

> Any controversy or claim arising out of or relating to this December 2004 Agreement, or the breach hereof, with the exception of any claim for a temporary restraining order or preliminary or permanent injunctive relief to enjoin any breach or threatened breach hereof, shall be settled by binding arbitration to be conducted by the American Arbitration Association ('AAA') in New York City in accordance with the Optional Procedures for Large Complex Commercial Disputes (the "Complex Procedures"), and to the extent any such matter is not addressed by the Complex Procedures, in accordance with the Commercial Arbitration Rules of applying the laws of New York.

(Production Agreement ¶ 26). Significantly, the arbitration clause incorporates the procedures and rules of the AAA, which provide that the arbitrator shall have the power to

11

decide issues of arbitrability. (AAA Commercial Arbitration Rules [including Procedures for Large, Complex Commercial Disputes], Rule R-7) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."). Moreover, the arbitration clause indicates that "any controversy or claim arising out of or relating to" the agreement shall be submitted to arbitration. Ordinarily, such facts would provide "clear and unmistakable evidence" of the parties' intent to submit issues of arbitrability to the arbitrator. *See, Contec Corp. v. Remote Solution Co., LTD*, 398 F.3d 205, 208 (2d Cir. 2005) ("[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.") (citation omitted).

However, HFBC contends that the arbitration clause does not provide such clear and unmistakable evidence, for two reasons. First, it maintains the arbitration clause in the Production Agreement conflicts with the forum selection/dispute resolution clauses in the lease agreements, since the latter refer to judicial "resolution of any disputes under any lease document." (Pl. Reply Memo at 4-5). Second, HFBC argues that the arbitration clause itself is ambiguous, since it carves out an exception: "Any controversy or claim arising out of or relating to this December 2004 Agreement, or the breach hereof, *with the exception of any claim for a temporary restraining order or preliminary or permanent injunctive relief to enjoin any breach or threatened breach hereof*, shall be settled by binding arbitration[.]" (emphasis added). In support of its position, HFBC cites two decisions: *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) ("*Katz*"), and *Eaton Vance Mgt. v. Forstmannleff Assoc., LLC*, No. 06 Civ. 1510 (WHP), 2006 WL 2331009 (S.D.N.Y. Aug. 11, 2006) ("*Eaton Vance*").

In *Katz*, the relevant agreement, which concerned the sale of a clothing business, contained a general arbitration clause, and a more-specific clause providing for the valuation of the business by a third-party accountant. The general arbitration provision directed that all disputes would be arbitrated under the rules of the AAA. *Katz*, 290 F.3d at 96. On the other hand, the valuation provision expressly provided that the accountant's valuation determination would be final and binding on the parties, and would "not be subject to any appeal, *arbitration*, proceeding, adjustment or review of any nature whatsoever." *Id*. (emphasis added). The court found that the presence of both clauses created an ambiguity, which required the question of arbitrability of the valuation provision to be resolved by the court, not the arbitrator. *Id*. at 97.

In *Eaton Vance*, the subject employment agreement contained a broad arbitration provision which required that "any controversy or claim" arising from the agreement be settled by arbitration in accordance with the AAA's "National Rules for the Resolution of Employment Disputes," with one exception, that being "claims for specific performance or injunctive relief pursuant to Section 8 hereof." *Id*., 2006 WL 2331009 at *1. The district court noted that there was a presumption that the court should resolve the issue of arbitrability, unless there was "clear and unmistakable evidence" that the parties had agreed to arbitrate arbitrability, and that such clear and unmistakable evidence could be shown in *one of two ways*: "[B]y entering into a separate agreement that (1) employs 'any and all' language, *or* (2) expressly incorporates the provisions of a tribunal that requires questions of arbitrability to be decided in the arbitration." *Id*. at *3 (citation and internal quotation marks omitted). The court found that the agreement did not meet the second of these prongs, since the applicable AAA rules for *employment disputes* did not permit arbitrators to decide the issue of arbitrability. *Id*. at *4. Further, the court found that the

13

agreements "any and all" language was ambiguous, since it contained an exception for the initiation of proceedings for specific performance or injunctive relief. *Id*.

As the foregoing summaries indicate, the facts of *Katz* and *Eaton Vance* are not identical to the facts of the instant case. Nevertheless, the Court is persuaded, for the reasons stated by HFBC, that there is not clear and unmistakable evidence that the parties intended to arbitrate the arbitrability of disputes involving the lease agreements. Accordingly, the Court will address the issue of arbitrability.

In deciding whether Boston Beer's equipment claims are arbitrable, the law in this regard is well settled:

> It is familiar law that the [FAA] . . . expresses a liberal federal policy favoring arbitration agreements and that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.
>
> \*\*\*
>
> To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court should undertake a three-part inquiry. First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 223-224 (2d Cir. 2001) (citations and internal quotation marks omitted), *cert. den*., 534 U.S. 1020, 122 S.Ct. 546 (2001).

In this case, the parties agree that the Production Agreement's arbitration clause is broad. Consequently, based on the applicable principles of law, there is a presumption that non-collateral matters are arbitrable, and that collateral matters will be arbitrable if they

implicate issues of contract construction or issues of the parties' rights and obligations under the Production Agreement. *See, id.; see also, In re Winimo Realty Corp.*, 276 B.R. 334, 338 (S.D.N.Y. 2001).

Here, Boston Beer contends that the equipment leases are collateral to the Production Agreement, but that the equipment claims are nevertheless arbitrable since they implicate the parties' rights under the Production Agreement. HFBC does not specifically challenge Boston Beer's contention that the leases are collateral. Nevertheless, the Court finds that they are not collateral. In that regard, "a collateral agreement is a separate, side agreement, connected with the principal contract which contains the arbitration clause." *Louis Dreyfus Negoce, S.A.*, 252 F.3d at 228 (citation and internal quotation marks omitted). However, side agreements are not collateral if they specifically incorporate or reference the main agreement. *Id*. In this case, both the Line 2 Lease and the Additional Equipment Lease specifically reference the Production Agreement. (Line 2 Lease § 1.3; Additional Equipment Lease § § 1.3, 1.4, 5.5). Consequently, the leases are non-collateral, and the presumption of arbitrability applies.

Morever, even if the leases were collateral, Boston Beer's equipment claims would still be arbitrable, since they implicate issues of contract construction and of the parties' rights and obligations under the Production Agreement. In that regard, Boston Beer's arbitration complaint alleges that Boston Beer owns the Line 2 equipment and the Carbo Cooler, and that HFBC converted the equipment. Boston Beer further alleges that it is entitled to foreclose a security interest in the equipment. Such claims implicate the following aspects of the Production Agreement: The December 2004 Agreement, § § 9,

15

10(c); the April 2006 Supplement, § 2; the June 2006 Supplement, § 3; the December 2007 Amendment, § § 4, 6, 7; and the January 2009 Amendment.[11]

Nonetheless, HFBC argues that *Louis Dreyfus Negoce* does not apply in this case. Instead, relying upon *Katz v. Feinberg*, cited above, and other cases, HFBC contends that where an agreement contains a general arbitration clause and another, more specific dispute resolution clause, the court must apply the more specific provision. On this point, HFBC contends that the leases' forum selection/dispute resolution clauses are more specific than the arbitration clause, and should therefore govern. The Court disagrees. First, the *Katz* case is not entirely on point, since it involved an agreement with a general arbitration clause and a more-specific dispute resolution provision which *specifically excluded* arbitration. See, *Katz v. Feinberg*, 290 F.3d at 98.[12] In this case, the leases' forum selection/dispute resolution clauses do not specifically exclude arbitration. Moreover, in a case decided a few years after *Katz*, the Second Circuit held that where an agreement has both a general arbitration clause and forum selection clause that consents to court jurisdiction but does not mention arbitration, the arbitration clause prevails. *See, Bank Julius Baer & Co., Ltd. v. Waxfield, Ltd.*, 424 F.3d 278, 283-284 (2d Cir. 2005). In *Bank Julius Baer*, the court stated:

> Under our cases, if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must choose it: The existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration

---

[11]HFBC maintains that the equipment claims "will be determined solely by reference to the Equipment Leases" (Pl. Memo of Law at 17), but the Court disagrees. The equipment claims cannot be resolved without reading the Production Agreement and the leases together.

[12] The court in *Katz* gave weight to this fact, even though it was not the primary reason for its decision. See, id. ("Under existing law, we find that the more specific assignment should govern. Furthermore, the Court notes that in this case, the inclusion in § 2(b) of language not only making the accountants' determination "final and binding," but also excluding it from "any appeal, arbitration, proceeding, adjustment or review of any nature whatsoever" further affirms the parties' intent to exclude determinations assigned to the accountants under § 2(b) from later challenge under the general arbitration provision[.]").

16

clause is not susceptible of an interpretation that covers the asserted dispute. Moreover, we cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration. In the circumstances presented to us in this appeal, we cannot say that the Forum Selection Clause, which does not even mention arbitration, either 'specifically precludes' arbitration or contains a 'positive assurance' that this dispute is not governed by the Arbitration Agreement.

*Id*. at 284 (citations and internal quotation marks omitted). Significantly, the forum selection/dispute resolution provision in the subject leases is quite similar to one of the forum selection clauses discussed in *Bank Julius Baer*. *Id*. at 284.[13] Consequently, while HFBC refers to the leases' forum selection/dispute resolution provisions as a "judicial resolution provisions," they are "forum selection clauses" within the meaning of *Bank Julius Baer*. Since these clauses do not specifically preclude arbitration or otherwise provide positive assurance that the subject equipment claims are excluded from arbitration, the arbitration clause prevails. Therefore, HFBC has not shown that it is likely to succeed on the merits of its claim.

## CONCLUSION

Accordingly, Plaintiffs' application [#7] for preliminary injunctive relief is denied.

SO ORDERED.

Dated: June 8, 2010
Rochester, New York

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[13] The forum selection clause stated: "[T]his Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New Jersey, and the Company hereby submits to the jurisdiction of the courts of the State of New Jersey and of any federal court sitting in the State of New Jersey with respect to controversies arising under this Agreement." *Id*. (*quoting Patten Securities Corp. V. Diamond Greyhound & Genetics*, 819 F.2d 400 (3d Cir. 1987)).

17