UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

—————————————————————

HIGH FALLS BREWING COMPANY, LLC,
HIGH FALLS OPERATING CO., LLC,
NORTH AMERICAN BREWERIES, INC.,                           DECISION AND ORDER
and KPS CAPITAL PARTNERS LP,

                                     Plaintiff,           10-CV-6100 CJS

              -v-

BOSTON BEER CORPORATION,

                                     Defendants.

—————————————————————

APPEARANCES

For High Falls Brewing
Company, LLC:
                                     Edward F. Premo, II
                                     Jerauld E. Brydges, Esq.
                                     Kimberly I. Shimomura, Esq.
                                     Harter, Secrest and Emery, LLP
                                     1600 Bausch & Lomb Place
                                     Rochester, New York 14604-2711


For High Falls Operating
Co, LLC, North American
Breweries, Inc. and KPS
Capital Partners LP:
                                     Randall David White, Esq.
                                     Terrence M. Connors, Esq.
                                     Connors & Vilardo, LLP
                                     1000 Liberty Building
                                     424 Main Street
                                     Buffalo, New York 14202

                                     Gregory M. Boyle, Esq.
                                     Erinn L. Wehrman, Esq.
                                     Jenner & Block, LLP
                                     353 North Clark Street
                                     Chicago, Illinois 60654-3456

                                                          (Continued)

For Defendant:                George J. Skelly, Esq.
                              Carolyn G. Nussbaum, Esq.
                              J. Christopher Allen, Esq.
                              Nixon Peabody LLP
                              1100 Clinton Square
                              Rochester, New York 14604

                              Richard A. McGuirk, Esq.
                              LeclairRyan
                              70 Linden Oaks, Suite 210
                              Rochester, New York 14625


## INTRODUCTION

This is a diversity action arising from a contractual dispute.  Defendant asserted a counterclaim for tortious interference with contract.   Plaintiffs moved to dismiss the counterclaim pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6).  On August 4, 2011, the Court granted the application and dismissed the counterclaim. *See*, Decision and Order, Docket No. [#42].   Now before the Court are Defendant's motion [#43] for reconsideration of that decision, or in the alternative, for leave to re-plead the counterclaim, and Defendant's motion [#49] for entry of judgment on a related arbitration award, pursuant to FRCP 54(b).  The first application is denied, and the second application is granted.

## BACKGROUND

The reader is presumed to be familiar with the prior Decision and Order [#42], in which the facts were set forth in the light most-favorable to Defendant.   To briefly summarize, Defendant was a party to a contract ("the Production Agreement") with High Falls Brewing Company, LLC ("HFBC"), a brewery in Rochester, New York.  Pursuant to that agreement, HFBC was required to produce beer and other beverages for Defendant, through the year 2014.  In 2009, HFBC contracted to sell substantially all of its assets to

2

OpCo.[1]   OpCo is a subsidiary of KPS, a private equity fund.   OpCo, KPS, and North American Breweries ("NAB") intended to use HFBC's assets to operate their own brewery. OpCo, KPS and NAB were aware of the Production Agreement between HFBC and Defendant, and were interested in assuming HFBC's interest in the agreement as part of the asset purchase.   However, OpCo and Defendant were not able to come to terms regarding an assignment of the Production Agreement.[2]   *See*, Answer and Counterclaims [#20] at p. 15,   ¶ 17.   Consequently, OpCo purchased HFBC's assets without assuming HFBC's obligations under the Production Agreement.   OpCo then began doing business under NAB's name.   Although Defendant and OpCo had further discussions about whether OpCo/NAB would perform HFBC's obligations under the Production Agreement, OpCo ultimately declined to do so.   Thereafter, HFBC failed to fulfill its obligations under the Production Agreement, since it no longer had the equipment or other assets with which to carry them out.

Defendant commenced an arbitration proceeding against Plaintiffs, who then commenced this action seeking declaratory and injunctive relief.   Defendant asserted a counterclaim in this action for tortious interference with contract, alleging that, by buying HFBC's assets, OpCo, KPS, and NAB "intentionally and improperly procured the breach by [HFBC[ of the Production Agreement."   On January 13, 2011, the Arbitrator issued an award finding, *inter alia*, that HFBC was liable to Defendant for $1.2 million in damages, and

---

[1]According to Movants, "HFBC's business was struggling, and OpCo was able to acquire its assets at a favorable price." Movants' Memo of Law [#24-5] at 8.

[2]Defendant agrees that OpCo was interested in taking over HFBC's rights under the Production Agreement, but maintains that it did not agree to the assignment, since HFBC "intend[ed] to assign the Production Agreement to [OpCo], but without any corresponding assumption of [HFBC's] obligations." Answer and Counterclaims [#20] at p. 4,   ¶ 20.

$77,100.00 for attorney's fees and expenses.  On May 31, 2011, the parties stipulated to the confirmation of the Arbitrator's award. *See*, Stipulation and Order [#38] ("IT IS HEREBY STIPULATED AND AGREED, by and between counsel for all parties hereto, that the Award of Arbitrator, dated January 13, 2011, and attached hereto as Exhibit B, is hereby confirmed pursuant to 9 U.S.C. § 9." ).  Consequently, the only unresolved claim in this action was Defendant's counterclaim for tortious interference with contract.

On June 18, 2010, Plaintiffs moved to dismiss the tortious interference counterclaim for failure to state a claim, and on August 4, 2010, the Court granted the application.  The Court based its decision on Restatement (Second) of Torts § 766, Comment n (1979), which indicates that one does not induce another to commit a breach of contract with a third person when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person. *See*, Decision and Order [#42] at pp. 6-9 (citing, inter alia, *Planet Payment, Inc. v. Nova Information Sys., Inc.*, No. 07-cv-2520 (CBA) (RML), 2011 WL 1636921 at *10-13 (Mar. 31, 2011) and *Beecher v. Feldstein*, 8 A.D.3d 597, 598, 780 N.Y.S.2d 153, 154 (2d Dept. 2004)).

Defendant then filed the subject motion [#43] for reconsideration or for leave to amend.  Defendant also filed the subject motion [#49] for immediate entry of judgment on the arbitration award.  On June 14, 2012, counsel for the parties appeared before the undersigned for oral argument.  Regarding the tortious interference claim, the Court asked Defendant's counsel to explain why OpCo's purchase of HFBC's assets did not fall under Restatement (Second) of Torts § 766, Comment n.  Counsel responded that this was not merely a situation where OpCo purchased HFBC's assets with knowledge that such sale would render HFBC unable to perform its Production Agreement with Defendant.  Instead,

4

counsel argued, HFBC initially refused to sell its assets unless OpCo agreed to assume the Production Agreement, whereupon OpCo responded by increasing its offer, specifically to persuade HFBC to forego its insistence that OpCo assume the Production Agreement, and to induce HFBC to breach that agreement.[3]  In that regard, Defendant's counsel argued, OpCo "upped the ante" and "sweetened the pot," which amounted to tortious interference. As authority for that argument, Defendant cited, among other cases, *Steuben Foods, Inc. v. Country Gourmet Foods, LLC*, No. 08–CV–561S(F), 2009 WL 3191464 (W.D.N.Y. Sep. 30, 2009).[4]

DISCUSSION

*Tortious Interference With Contract*

Under New York law,  "[t]ortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82 (1996) (citations omitted).  For purposes of the instant motion, it is undisputed that a contract existed between Defendant and HFBC, that Plaintiffs were aware of the contract, that HFBC breached the contract, and that Defendant sustained damages.  The disputed issue is

---

[3]These allegations are discussed further below.

[4]Defendant did not cite this case in its brief, and only supplied it to the Court and opposing counsel at oral argument.  However, the Court recalls having found and reviewed this case in connection with the preparation of its prior Decision and Order [#42] issued on August 2, 2011. The Court did not cite the decision then because it apparently concluded, as it does again today, as discussed further below, that it is factually inapposite.

whether Plaintiffs/Counterclaim-Defendants intentionally and improperly procured the breach.

"[W]here there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." *NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 621 (1996) (citations omitted). According to the pertinent section of the Restatement (Second) of Torts, deliberate or intentional interference may be shown where the defendant is certain, or substantially certain, that his actions will result in a breach of the contract:

> *Intent and purpose.* The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. The rule is broader, however, in its application than to cases in which the defendant has acted with this purpose or desire. It applies also to intentional interference, as that term is defined in § 8A,[5] in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.

Restatement (Second) of Torts § 766, comment j (1979); *see also, Union Carbide Corp. v. Montell N.V.*, 944 F.Supp. 1119, 1137 (S.D.N.Y. 1996) (Denying 12(b)(6) motion, where allegations in pleading "provide[d] ample support for the inference that [defendant] either knew that its actions were certain or substantially certain to induce a breach . . . or acted

---

[5]"The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement 2d Torts § 8A (1979); *see also, id.*, comment b ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.").

with the primary purpose of inducing a breach."); *@Wireless Enterprises, Inc. v. Al Consulting, LLC*, No. 05–CV–6176 CJS(P), 2011 WL 1871214 at *11 (W.D.N.Y. May 16, 2011) ("A defendant intentionally procures a breach when he 'knows of a valid ... contract' and 'commits an intentional act whose probable and foreseeable outcome is that one party will breach the contract, causing the other party damage.'") (*quoting Leventhal v. Franzus Co., Inc.*, No. 88 CIV. 3547(MBM), 1988 WL 132868 at *7 (S.D.N.Y. Dec. 6, 1988)).

On the other hand, a party does not induce or procure a breach of contract when he "merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person." Restatement (Second) of Torts § 766, Comment n (1979).  On this point, the Restatement says:

> n. *Making agreement with knowledge of the breach*.  One does not induce another to commit a breach of contract with a third person under the rule stated in this Section when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person.  . . .  For instance, B is under contract to sell certain goods to C. He offers to sell them to A, who knows of the contract.  A accepts the offer and receives the goods.  A has not induced the breach and is not subject to liability under the rule stated in this Section.

*Id.*; *see also, NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 759 F.Supp. 1004, 1016 (S.D.N.Y. 1991) ("WCP contends [that] the conditions placed on the sale by GFV, namely the fact that it would not assume the requirements contract and its demand of a non-compete clause from NCC, caused the contract's breach. The problem with this argument, however, is that it still fails to show any improper, malicious, or unjustified conduct by GFV suggesting an intent to cause the breach of contract. Granted, GFV knew of the NCC/WCP contract when it purchased NCC's assets. Moreover, it probably can be inferred

that GFV knew that if it purchased NCC's assets, NCC would no longer be able to comply with its contract with WCP. Nonetheless, these facts fail to establish anything more than an incidental interference with WCP's contractual rights and this is insufficient to create liability under a theory of tortious interference with contract.") (citation omitted).

### Motion For Reconsideration

Defendant asks the Court to reconsider its prior Decision and Order pursuant to FRCP 54(b), or, in the alternative, to permit Defendant to re-plead the cause of action for tortious interference, pursuant to FRCP 15.  As for the motion to reconsider, FRCP 54(b) provides that

> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

"Under Fed.R.Civ.P. 54(b) as well as the inherent power of the court to reconsider a prior decision at any time before the entry of final judgment, the major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Shervington v. Village of Piermont*, 732 F.Supp.2d 423, 425 (S.D.N.Y. 2010) (citations omitted).

Defendant maintains that reconsideration is required to correct a clear error by the Court.  In that regard, Defendant contends that the dismissed counterclaim adequately pleaded a claim for tortious interference, since it alleged that OpCo did more than merely purchase HFBC's assets, knowing that such purchase would prevent HFBC from performing its contract with Defendant.  According to Defendant, the dismissed counterclaim pleaded that OpCo actively induced HFBC to breach the production agreement with Defendant. *See*,

8

Def. Memo of Law [#43].  The Court disagrees, since the relevant portions of the Answer with Counterclaims [#20] merely alleged the following facts: 1) HFBC and OpCo were aware of the production agreement; 2) HFBC agreed to sell its assets to OpCo, without ensuring that OpCo would honor HFBC's obligations under the production agreement; 3) OpCo expressed interest in doing business with Defendant, but not in assuming HFBC's obligations; 4) OpCo and Defendant failed to reach a new agreement; and 5) HFBC failed to perform its contractual obligations. *See, id.* at pp. 14-16, Counterclaim ¶ ¶ 15-26.  The counterclaim's conclusory statement that OpCo "stripp[ed] [HFBC] of substantially all of its operating assets, there rendering [HFBC] unable to perform its obligations under the Production Agreement" is simply another way of saying that OpCo purchased HFBC's assets.

Defendant nevertheless argues that OpCo could have purchased HFBC's assets "while still allowing for performance - for example, by assuming HFBC's obligations to [Defendant] or permitting HFBC use of the brewery to comply with the Production Agreement." Def. Memo of Law [#43-1] at p. 13.   However, OpCo was not under any obligation to assume HFBC's contractual duties, and did not commit a tort by declining to do so. *See*, Restatement (Second) of Torts § 766, Comment n (1979).  Similarly, OpCo had no obligation to allow HFBC to continue using assets which it no longer owned. Consequently, the motion for reconsideration is denied.

<u>Motion to Amend</u>

Courts must freely give leave to amend pleadings "when justice so requires." FRCP 15(a)(2).  Nevertheless, a "district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Holmes*

9

*v. Grubman*, 568 F.3d 329, 334 (2d Cir.2009) (internal quotation marks omitted).  "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Martin v. Dickson*, No. 03-7917, 100 Fed.Appx. 14, 16, 2004 WL 1205185 at *2 (2d Cir. Jun. 2, 2004) (unpublished).  In ruling upon a motion to dismiss under FRCP 12(b)(6), the Court must construe

> the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. Although the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice. To survive dismissal, the plaintiff must provide the grounds upon which her claim rests through factual allegations sufficient to raise a right to relief above the speculative level.

*Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 131 (2d Cir. 2007) (citations and internal quotation marks omitted).

A complaint must contain "a short and plain statement of the grounds for the court's jurisdiction," as well as "a short and plain statement of the claim, showing that the pleader is entitled to relief." FRCP 8(a).  However, to be plausible, a claim must be supported by more than conclusory accusations.  Specifically,

> [a]s the [Supreme] Court held in [*Bell Atlantic v.*] *Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Nor does a complaint suffice if it tenders "naked assertions" devoid of "further factual enhancement."
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent

10

with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Two working principles underlie [the] decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-679, 129 S.Ct. 1937, 1949-1950 (2009).

Earlier, this Court discussed the facts pleaded in support of the now-dismissed counterclaim. The Proposed Second Amended Answer and Counterclaim alleges these additional facts: 1) John Henderson was HFBC's Chief Financial Officer; 2) 3) Henderson wanted OpCo to honor the Production Agreement; 3) KPS and OpCo did not want to assume HFBC's obligation under the Production Agreement, because it "would be economically disadvantageous to them"[6]; 4) for example, KPS and OpCo believed that "tying up the . . . brewery with the obligation to brew large volumes of Boston Beer through 2014 would inhibit their strategy to focus [their] brewing operations on growing OpCo's own brands"[7]; 5) consequently, KPS and OpCo negotiated for a purchase arrangement that did not include assuming HFBC's obligations under the production agreement; 6) Henderson and other HFBC principals had made substantial loans to HFBC; 7) as part of the offer to

---

[6]Proposed Second Amended Answer [#43-5] at p. 17, ¶ 22.

[7]Proposed Second Amended Answer [#43-5] at p. 17, ¶ 23.

11

purchase HFBC, KPS and OpCo agreed to assume HFBC's obligation to repay the aforementioned loans to HFBC's principals, but did not agree to assume HFBC's obligations to other creditors; 8) upon purchasing HFBC, KPS and OpCo retained Henderson as Chief Financial Officer; 9) subsequent to the asset purchase, KPS and OpCo unsuccessfully attempted to re-negotiate a production agreement with Defendant on more favorable terms; 10) KPS and OpCo did assume certain other production agreements that HFBC had with different brewers; and 11) following the asset sale, HFBC breached the Production Agreement because it no longer had the equipment with which to brew beer.  *See*, Proposed Second Amended Answer and Counterclaim [#43-5].

The preceding paragraph accurately summarizes the *facts* pleaded in the Proposed Second Amended Answer.  Along with those facts, however, Defendant has included *characterizations* and conclusions suggesting that Plaintiffs acted improperly. Specifically, in pertinent part,  Defendant states as follows:

> Late in 2008, KPS had introductory discussions with HFBC management about a potential acquisition of HFBC's business and began to conduct due diligence.

> Thereafter, over the course of several months, KPS conducted negotiations with HFBC principals as well as other stakeholders in HFBC's business, including certain of HFBC's secured and unsecured creditors.

> In the course of its due diligence, KPS became fully aware of HFBC's long term substantial contract obligations to Boston Beer under the Production Agreement.

> John Henderson was the Chief Financial Officer of HFBC throughout 2008 and  through the beginning of February 2009, and he was the HFBC officer most directly involved in discussions with KPS regarding the Boston Beer Production Agreement as well as a possible deal between HFBC, KPS and OpCo.

12

***

HFBC, and Mr. Henderson, knew and understood that there were a number of ways that they could ensure that the Production Agreement would continue to be performed. One possibility, of course, was simply to decline to do an acquisition deal with KPS and OpCo unless arrangements were made to perform the Production Agreement. HFBC could, for example, insist that OpCo agree to assume the Production Agreement as a condition to agreeing to the acquisition. Another possibility was that HFBC enter into an acquisition agreement, but at the same time enter into an agreement for OpCo to provide HFBC (or Boston Beer) with "capacity" rights to brew the volumes in the Production Agreement for Boston Beer. Such agreements for brewing "capacity" are not uncommon in the industry.

Indeed, in discussing a possible deal by KPS to acquire and operate the business of HFBC, John Henderson, on information and belief, initially proposed that the contract obligations to Boston Beer under the Production Agreement be honored even if an acquisition of HFBC's business occurred.

In correspondence with Boston Beer and in telephone discussions with Boston Beer principals in mid February 2009, Mr. Henderson indicated that HFBC's intention at that time was to ensure that HFBC's obligations to Boston Beer under the Production Agreement. would continue to be fulfilled.

However, upon information and belief, that soon changed as a result of KPS and OpCo's inducements to Mr. Henderson and others at HFBC to cause HFBC to breach the Production Agreement, as more fully alleged below.

Upon information and belief, KPS and OpCo decided at some time prior to February 19, 2009 that the terms of the Production Agreement would be economically disadvantageous to them if they were to acquire HFBC's business.

In addition, upon information and belief, KPS and OpCo anticipated that they would compete with Boston Beer in brewing and selling other brands of beer, and on information and belief determined that tying up the HFBC brewery with the obligation to brew large volumes of beer for Boston Beer through 2014 would inhibit their strategy to focus the brewing operations on growing OpCo's own brands if there were an acquisition.

For these and other reasons, upon information and belief, KPS and OpCo sought out ways to induce HFBC to breach the Production Agreement.

KPS and OpCo knew and understood that they could convince Mr. Henderson and other HFBC principals to drop any insistence on continued performance of the Boston Beer Production Agreement by appealing to their personal financial interests.

KPS and OpCo were aware as a result of their due diligence, that John Henderson and other officers and directors of HFBC, had made hundreds of thousands of dollars of personal investments in HFBC through certain entities (hereinafter the "HFBC Investment Entities") in the form of participations in notes.

Upon information and belief, as an inducement for proceeding with a sale of HFBC's business on terms that KPS and OpCo preferred, including reneging on the contract obligations to Boston Beer, KPS and OpCo offered Mr. Henderson and one or more other officers and directors of HFBC highly preferential treatment on the notes extended to HFBC by the HFBC Investment Entities. Indeed, KPS and OpCo offered to assume HFBC's obligations to make payment on those notes to the HFBC Investment Entities (and thereby secure the six-figure investments of HFBC's officers and directors, including Mr. Henderson) on very favorable terms – but only if HFBC walked away from the Production Agreement.

Upon information and belief, as an additional wrongful inducement to cause HFBC to repudiate the Production Agreement, KPS and OpCo offered Mr. Henderson continued employment as in a high level executive position at OpCo – but, again, only if the acquisition deal was done and done on KPS's terms, which included dropping any insistence on complying with the Production Agreement.

Upon information and belief, as a direct result of KPS and OpCo's wrongful inducements to John Henderson and other principals at HFBC, on about February 19, 2009, HFBC agreed to sell substantially all its assets to OpCo without making any provision for performance of the obligations due to Boston Beer under the Production Agreement.

***

Stripped of its assets and unable to perform, HFBC repudiated the Production Agreement.

On information and belief, John Henderson became the Chief Financial Officer of OpCo effective upon or immediately after the sale of HFBC's assets.

14

On information and belief, OpCo and/or KPS agreed to pay the notes of the HFBC Investment entities on favorable terms that were not extended to other creditors of HFBC effective upon the sale of HFBC's assets.

Upon information and belief, in contrast to the special preferred treatment offered to Mr. Henderson and the other HFBC principals on their investments, KPS and OpCo exacted significant financial concessions from HFBC's other creditors such that they would receive no such payments or would only receive payments on substantially less favorable terms.

On February 27, 2009, John Henderson, acting as OpCo's new Chief Financial Officer sent a letter to Boston Beer stating that OpCo would not perform HFBC's obligations under the Production Agreement.

KPS and OpCo attempted to renegotiate a new contract on terms that were more favorable to them than under the Production Agreement. However, an agreement was never reached, and OpCo ceased brewing for Boston Beer well before the end of the Production Agreement's term.

Upon information and belief, at the time it sold its assets to OpCo, HFBC was subject to several contracts besides the Production Agreement in which it agreed to produce beer for other brewers. In acquiring HFBC's assets, KPS and OpCo agreed to honor HFBC's commitments to its customers under all of those other agreements.

Proposed Second Amended Answer [#43-5] at pp. 14-23.

The instant case is similar to the situation presented in *Twombly*.  In that case, the plaintiff alleged that the defendant telecommunications providers had conspired to commit anti-competitive conduct and engaged in parallel behavior.  The Supreme Court disregarded the allegation of conspiracy, since it was a mere legal conclusion that was not entitled to the assumption of truth. *See, Ashcroft v. Iqbal*, 129 S.Ct. at 1950.  The Court then considered whether the "nonconclusory factual allegation of parallel behavior" was sufficient to plausibly suggest a conspiracy. *See, Id*.  The Court concluded that it was not:

Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest

15

> an illicit accord because *it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior.* [*Twombly*, 550 U.S.] at 567, 127 S.Ct. 1955. Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed. *Id.*, at 570, 127 S.Ct. 1955.

*Ascroft v. Iqbal*, 129 S.Ct. at 1950 (emphasis added). Likewise, in *Iqbal*, the Supreme Court found that the plaintiff's claim, that he was discriminatorily detained because he was an Arab Muslim, was not plausible, because, apart from conclusory allegations that were not entitled to the assumption of truth, the factual allegations did not plausibly establish a claim of invidious discrimination, because there was an equally consistent and more plausible explanation for the plaintiff's treatment. *See, Iqbal*, 129 S.Ct. at 1951-1952 ("Taken as true, [plaintiff's allegations concerning his detention following the September 11, 2001 terrorist attacks] are consistent with [defendants] purposefully designating detainees 'of high interest' because of their race, religion, or national origin. *But given more likely explanations, they do not plausibly establish this purpose.* . . . [T]he arrests . . . were likely lawful and justified by . . . nondiscriminatory intent to detain aliens who were illegally present in the United States  and who had potential connections to those who committed terrorist acts.  As between that 'obvious alternative explanation' for the arrests, *Twombly*, supra, at 567, 127 S.Ct. 1955, and the purposeful invidious discrimination [plaintiff] asks us to infer, discrimination is not a plausible conclusion.") (emphasis added).

Here, the proposed pleading similarly contains a number of bare conclusory assertions that are not entitled to the assumption of truth.  Specifically, the allegations that KPS and OpCo induced HFBC and its principals to breach the Production Agreement "amount to nothing more than a formulaic recitation of the elements" of a claim of tortious

interference with contract. *See, Iqbal*, 129 S.Ct. at 1951.  As such, the Court does not assume that they are true.

As for the non-conclusory factual allegations, Defendant alleges, "upon information and belief," that OpCo offered to assume the debt owed to HFBC's principals, "but only if HFBC walked away from the Production Agreement," and that, "as an additional wrongful inducement," OpCo offered to hire Henderson, "but again, only if the acquisition deal was done and done on KPS's [and OpCo's] terms, which included dropping any insistence on complying with the Production Agreement." Proposed Second Amended Answer and Counterclaim [#43-5] at p. 19, ¶ ¶ 27-28.

Defendant further argues, orally and in their briefs, that KPS and OpCo actually increased their initial purchase offer specifically to induce HFBC and its principals to breach the Production Agreement.  Even assuming, *arguendo*, that such allegations would be enough to state a claim for tortious interference, those allegations are not in the proposed pleading.  At most, the proposed pleading indicates, upon information and belief only, that at the start of the negotiation, HFBC wanted OpCo to assume the Production Agreement. There is no factual allegation that such desire was a potential "deal breaker," as Defendant implies, or that OpCo made multiple purchase offers, or that it increased a purchase offer specifically to overcome HFBC's insistence that the Production Agreement be assumed.

These are the type of "naked assertions" devoid of "further factual enhancement" that are insufficient to state a claim.  Such allegations are "consistent with" Defendant's theory of tortious interference.  However, they are not plausible in light of the more likely and eminently more plausible view of the facts, which is that KPS and OpCo merely paid HFBC to sell its assets, not  to breach the Production Agreement.

17

Stripped of Defendant's spin, the pleaded facts indicate only that KPS and OpCo wanted to buy HFBC's assets, but did not want to assume the liabilities under the Production Agreement because they did not believe that it was financially advantageous to do so. Although, reportedly, HFBC initially wanted KPS and OpCo to assume the Production Agreement, it ultimately agreed to sell its assets on terms that did not require KPS and OpCo to assume the Production Agreement.  Since HFBC was selling all of its assets, as a practical matter it was not going to be in a position to continue performing under the Production Agreement.  If the asset sale was going to occur without OpCo assuming the Production Agreement, the incidental result was clearly going to be that HFBC would breach that agreement with Defendant, and as such, there would have been no need or reason for OpCo to "procure" such breach.  Consequently, Defendant's suggestion that KPS and OpCo paid additional money to specifically induce HFBC to breach the Production Agreement is not plausible.[8]

Defendant belatedly cites *Steuben Foods, Inc. v. Country Gourmet Foods*, LLC, 2009 WL 3191464 (W.D.N.Y. Sep. 30, 2009) as proof that its claim has merit.  The Court disagrees, since that case is factually inapposite, and would not be binding on this Court in any event.

Defendant nevertheless contends that OpCo threatened to "refuse to deal" with HFBC, unless HFBC breached the Production Agreement.  That is, Defendant contends, in

---

[8]The proposed pleading indicates that OpCo viewed Defendant as a competitor.  However, the pleading does not indicate that OpCo sought to harm Defendant because it was a competitor.  Instead, it indicates that OpCo did not want to be burdened with producing Defendant's beer, because it wanted the freedom to develop its own brands.  In any event, any suggestion that OpCo did not want to brew beer for Defendant because  they were competitors is belied by the other allegations in the proposed pleading, which indicate that OpCo was willing to honor production agreements with other brewers, and that it was also interested in brewing beer for Defendant, but not on the terms contained in the Production Agreement .  Again, this theory is not plausible in light of the "obvious alternative explanation."

conclusory fashion, that OpCo would not agree to buy the assets unless HFBC agreed to breach the production agreement.  Again, this is only Defendant's version of the fact that OpCo purchased HFBC's assets without assuming the Production Agreement.  In any event, Defendant argues that such behavior constitutes tortious interference, pursuant to Comment l to Restatement (Second) of Torts, § 766. *See*, Def. Memo of Law at pp. 8-9.  However, for the same reasons discussed above, the Court does not agree that Defendant has pleaded a plausible claim of tortious interference based on a refusal to deal.  Contrary to Defendant's characterization of events, refusing to assume a company's obligations as part of an asset purchase is not a refusal to deal within the meaning of Comment l.

If the Court were to allow the proposed counter claim to go forward, it would open the door for merit-less tortious interference claims to be brought, and discovery to be conducted, any time someone purchased a company's assets without also assuming the company's contractual obligations.  Such a ruling would be inconsistent with the law of New York, which is that, "[g]enerally, a party cannot be held liable for tortious interference for refusing to assume a contract." *Planet Payment, Inc. v. Nova Information Systems, Inc.*, 2011 WL 1636921 at * 12 (citing *Highland Capital Mgt. LP. v. Schneider*, 198 Fed. Appx. 41, 46 (2d Cir. 2006), other citation omitted).

Since the proposed claim cannot survive a motion to dismiss under FRCP 12(b)(6), the motion to amend is denied on the grounds of futility. *See, Beecher v. Feldstein*, 8 A.D.3d 597, 598, 780 N.Y.S.2d 153, 154 (2d Dept. 2004) (Defendant did not procure breach of lease between car dealership and dealership's patron, where Defendant purchased dealership but did not assume balance of auto lease, and relocated dealership.  As the court

held, the "defendant's actions did not procure and were merely incidental to the dealership's breach of the lease.").

The proposed tortious interference claim was the only unresolved claim in this action. Because the Court is denying the motion for reconsideration and for leave to re-plead, there is no reason to delay entry of judgment on the related arbitration award. Accordingly, Defendant's motion [#49] for judgment on the arbitration award is granted.

## CONCLUSION

Defendant's motion [#43] to amend, or in the alternative, for reconsideration, is denied. Defendant's motion [#49] for entry of judgment is granted. The Clerk of the Court is directed to close this action.

SO ORDERED.

Dated:      June 26, 2012
            Rochester, New York

                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge